Good morning, Your Honors. May it please the Court, my name is Allison Fairchild. I represent the appellant, Kathy Walden, who is in the courtroom today, sitting in the front row. The issue on this appeal is very specific and very discreet. The district court judge determined that there was no protected speech at issue in this case. It's appellant's position that the district court erred in that finding and that there remains a disputed issue of material fact regarding the threshold issue of whether or not her speech was actually protected. What speech do you believe was protected? I think that there were several items of speech over the course of several years that were protected in this matter. I think it started in 1996 and 1997 when Charles Rowe began work in the finance division as the town manager. The issues that Kathy Walden spoke of were not issues of dress code or scheduling or anything very internal and specific to her and the division, but rather to matters of the finance division as a whole, the management of the division as a whole. And I think that the case law, the cases where speech has been held to be protected The trouble that I'm having with your presentation is you're sort of lumping everything together in the abstract, and I think it would be more helpful to be specific. And if you have instances of protected speech as you see it, tell us exactly what those are. Because it does seem to me that on many of the occasions that you identify, these were discussions about things very personal to her, other than maybe the Wendland conversation. Okay. The Wendland conversation, we can start there. There is testimony in the record from Daniel Wendland, who is a council member, that Kathy Walden did bring to him matters of public concern, i.e. Precisely what? That there was some misrepresentation regarding town account balances, and that she was concerned about the overall management of this division by Mr. Rowe. And your argument there is this was a matter of public concern and therefore protected speech. What did the district court say specifically about that communication or that conversation? The district court actually stated that he believed that, first of all, he didn't understand who Daniel Wendland was. He thought it was the president of the Police Officers Association rather than a council member. And that she only directed this comment regarding the conflict of interest with Daniel, I mean with Charles Rowe's wife, at that one person who was the president of the Police Officers Association, not the council member, who then brought it to the attention of the entire council. And said, just made a finding of fact, basically, that that speech did not involve an issue of concern to the community at large. However, the case law clearly states that issues regarding public funds, regarding efficient handling of public funds, efficient management of divisions as a whole within a town, within a public agency, are issues of public concern. What I'm doing, among other things, is trying to telegraph some information to the other side so it can start thinking about the Wendland communication. Sure. And I think that there remains an issue of material fact purely from Wendland's testimony. If you look at Wendland's testimony, it specifically says, do you have an independent recollection as you sit here today that she was raising issues of financial impropriety? Yeah. Because I pretty strongly remember her talking about Mr. Rowe's wife being in there. I'm pretty sure that was one of the salient points of why that was brought up. And your theory, of course, is she was retaliated against for speaking out in this respect in the Wendland conversation? It's our theory of the case, which the district court didn't even get to, didn't even get beyond the threshold question. Something happened to her because she spoke to Wendland, and you're saying that's a truth? Something happened to her because she spoke to Charles Rowe. Something happened to her because she spoke to Mr. Wendland. Something happened to her because she spoke to the council. Something happened to her because she spoke to Mark Tain. And what was the something that happened? The retaliation that occurred to Kathy Walden included moving her desk around the office. Didn't she ask for that? No, it's my understanding that she did not ask for any of it. And wasn't that corrected anyway? Excuse me? Wasn't she moved to another desk? Wasn't that problem fixed? That was straightened out. She was put in the back of the area or something, wasn't she? She was eventually requested that it be moved again because it completely, yes, it was eventually moved again. And that's actionable retaliation in your view? I think with the other things that happened to her, yes, we do. What else happened? Well, ultimately, she was reclassified from a full-time to a part-time position, which is what we believe to be the ultimate retaliation. That was a plan proposed, though, in May of 1998, long before the protected speech. Actually, the protected speech that we're talking about is actually about that reorganization plan and how that reorganization plan was ultimately going to affect the financing. The plan was proposed before any of the speech, so how could it possibly be retaliation? It was in place, as far as I can tell from the record, that as of May 1998, it was outlined and proposed and then implemented over 18 months. The fact that she got a notice in June of 1999 doesn't seem to make any difference. The plan was in place a long earlier. It's my understanding that Charles Rowe is the one who developed that plan, and he didn't start until 1996. And so I also understand that. When did the protected speech occur? Starting in 19 ñ when Charles Rowe began, starting in 1997, then in 1998, culminating with the town council meeting in August of 1998. What happened? You've only discussed the one-tenth conversation in the town council meeting. What else was there? Planoff believes that her conversations with Mr. Rowe, who was her employer, and under the case law, she has a right to go to her employer with matters of public concern. She doesn't have to go to a public forum. Right. What were those about? Right. And she went to talk to him about the fact that there's a thing called 2% at 55, which involves pension benefits not just for Kathy Walden, but for all non-sworn employees of the town of Paradise. That's basically complaining about term employment. Actually, it's complaining about compensation, which in the McKinley case was held. Compensation levels undoubtedly affect the ability of the city to attract and retain qualified personnel, and competency of personnel is surely a matter of great public concern. She talks to a supervisor about compensation. It may be another thing if she goes and writes an editorial in the newspaper saying our employees are getting paid too little and therefore will lose employees or whatever. But talking to your supervisor about terms of your employment has never been held to be a matter of public concern. I mean, this is what employees do all the time. Every time somebody talks to a boss about a raise or not getting a raise or not getting a promotion or whatever, it becomes a matter of public concern. Actually, there's a Supreme Court case called Devon v. Western Line Consolidated that says neither the amendment, the First Amendment itself, nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. And that involved the term of employment? Well, I'm citing that case for the fact that she doesn't have to go to a newspaper, a public forum. It's one thing to cite a case. What were the facts and what was at issue? There was a resolution that was written up between bargaining units, which she was a member of, and the town regarding pension benefits, which is not just a term of her employment. It affected the compensation and pension benefits of all non-employees. What are you describing? You're describing a Supreme Court case? Excuse me? You're describing what, the Supreme Court case? No, I'm talking about her case. I'm talking about a specific case. I asked you about the Supreme Court case. Is that cited in your brief? It's actually a case that's cited in Connick, which is cited in all of our briefs. But the case that you just brought to our attention is not referenced in your table of authorities, is it? No, I don't believe it is. I'm sorry, I didn't write it. No, it's not. Anywhere in your brief? It is cited in a Connick case, which is cited in our brief. So the answer is no, it's not cited in your brief? The case specifically is not cited in our brief. Cited generally? The answer is no, this case is not cited. Actually, it's cited in, Connick is cited in, I think that quote is. Not Connick. I mean, you just brought to our attention a Supreme Court case, and we're simply trying to find it in your papers. Okay, then I will cite a Connick case, which says, we held that the First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly. So that is in a Connick case. But it has to be a matter of public concern. Right. And what I was trying to explain was the matter of public concern was that the resolution that was drafted up was misrepresented the agreement between the bargaining unit and the town. Kathy went, this involved all employees, not just Kathy. She went in to Mr. Rowe, chose to talk to her boss instead of going to a public forum,  which is going to affect the morale and the communication between bargaining units and the town, generally speaking, not to mention the fact that you're taking money from us that we agreed would go into this pension. Under McKinley, those specific matters actually are matters of public concern, quite clearly. Thank you. Thank you very much, Your Honors. The other side now. May it please the Court. My name is Franklin Gumpert, and I represent the town of Paradise in Charles Rowe. I'd like to focus on Judge Trott's question about the Wendland conversation, which took place on August 17, 1998. Was he a council person? He was. He telephoned, it's undisputed that he telephoned Kathy Walden at her home on August 17, 1998. This is not her coming out. Does it make any difference who initiates the conversation? Well, I guess it may be in terms of, again, with every First Amendment case, you have to look at form and context. The context is that he talked to her. He approached her. It wasn't like she felt that she had some burning desire to discuss an issue of public concern, and then she went out and solicited a forum within which to do it. But he did talk to her, and the conversation was about – That so makes no difference at all. I'm really wondering why you're making this, why you're raising this point. Again, the context becomes important, as well as the content. I'm just astonished by this. I mean, if someone has an interest that they feel is important to discuss with a public official or in a public forum. They feel it's important. They get solicited by a member of the public body that made the decision and says, gee, why should you do it? It's sort of if President Bush called me up and said, gee, what do you think, Alex, what do you think about the war in Iraq? I mean, I feel like I would write to him about it, but if he solicits my view, it would be a matter of public concern, right? And I do understand that. If you don't interrupt, Judge Kaczynski, we'll be able to understand your answers. Who initiated the conversation strikes me as utterly irrelevant. Again, it is a point, but it's not going to make a difference in this Court's decision, I know. I'll call you ten minutes talking about it anyway. I was trying to place the context. Because it's only going to go capillary when the jugular is just – So August 17, 1998, this conversation takes place in which she expresses a concern, as does Lenglen perhaps, about the fact that a volunteer, Roe's wife, is going to be working in finance. What is very important, again, recognizing the context and the form and content, is that there was never a suggestion that there was any mishandling of public funds. But that's still an impropriety, is it not? Pardon? It is still an impropriety to have the manager's unhired, non-employee wife handling public funds. I don't know why you would assume that. Maybe a fact finder might. Well, but why would it be – It's at least dubious. It's at least the kind of thing that one might raise concerns about. Well, remember that in the history of the town of Paradise, there had been an independent financial audit before, and one of the concerns was that only one person was handling both accounts receivable and accounts payable, and they wanted to change that so that there were different people involved. So there was a step taken. It may not be the perfect step, but the question really becomes, is it one of public concern as to who the person is, who the person is, not whether there's a division of duty so that there is one person looking at one side of the ledger and one side is the other. I think it would be inappropriate, particularly in a small town, to say that there should be automatic disqualification, even if she were an employee, just because she happened to be married to or lived with someone. Well, why isn't that the kind of – whether one ultimately considers it improper or not, why isn't that the kind of issue that one could legitimately raise a doubt about? I mean, let's say you found out that, you know, my wife's a lawyer, and I said, you know, I'm pretty busy, honey. How about if you come in and work with me on the Wallen case? You'd be a little concerned about that, wouldn't you? So here's somebody who's not – Well, my wife works in my law firm, so I'm not concerned at all. Here's somebody who's not – or my son, let's say, somebody who's not paid by the federal government, who doesn't have to go through some normal security check, you know, all the things we do when we hire people, working on public business. That's at least questionable, isn't it? Not in the least. And I don't know that there should be any assumption that the town of Paradise goes through the sophisticated FBI background check that might be required for a position of your stature. The reality is that the question becomes, is there an impropriety or even a suggestion of one, not who is the person who is working in an office. All we need to be concerned with, is it a matter of public concern to talk about something like that? I don't believe it is. Okay. I really don't, and I'll – Assume we don't agree with you. Assume – We just think it's a good assumption. Okay, so – Why don't you start from there, because you've got very few minutes left. I've got four minutes. Well, assuming that that is the only issue that you feel is a public concern and it's not the letter to the council in 1998 or the appearance at the town council in which she discussed her own personal grievances. She didn't just discuss her own grievances. At the end, I mean, she talked mostly about the plan and her own grievances, but at the end of her talk, she also got in this whole financial – I mean, she talked about preparing the W-2s, which arguably is her own grievance, but at the end, she did get into the whole question about the status of handling the finances. So it was not entirely a personal grievance thing, was it? Well, I think it was. As the record reflects. Well, the record reflects that at the town council meeting itself, she did not express any concerns about financial improprieties within the department. She was concerned. What she expressed at that meeting had to do with the preservation of her own job, the number of hours it would take for her to complete her duties, her concerns about having to do the W-2 forms and payroll reports, which had been part of her duties, whether someone else was going to be assigned her duties. This was an issue of job preservation for her, not, again, an issue of great public concern. Now, I will say, for instance, that in troubled budget times, and I know people in the state of California are addressing it, I guess you could say that everybody who ever, ever, ever spoke out about anything of a public nature, whoever wore a button or a flag on their lapel who might be part of a reduction in hours or a reduction in staff or a reorganization out of budgetary concern, which this clearly was, there's no question about it, that if that was true, that that would be a First Amendment retaliation claim and it would have to go to a jury. Now, council, I thought that you would be addressing the sequence of these events. Well, I can do that as well. You're talking about That's the only thing you've got going. Well, I would hope not. But the conversation with Gwen Linder was August 17 of 1998, her appearance at the town council in the letter August 18, 1998. The discussions about the 2% at 55, I think, is sort of irrelevant, when her own testimony was that she really wasn't involved in that negotiation process on behalf of the union. She continued to work. There was no specific adverse action taken against her. There was the moving of the desk. She complained. She was put back in a desk. That was taken care of. It was announced as one thing. There was a meeting, and she got what she wanted. She claims that she was given negative job evaluations or promotions that were denied. She, in fact, shortly before her voluntary resignation, was given a 2% or 2.5% bonus out of a recognition that she had been doing a good job. So it's pretty hard to state that there's negative evaluation. Now, I know that there are cases that suggest that if there are negative evaluations, per se, that that could be retaliation if it's connected to the action. I also am aware that the Did she say that some of the retaliation involved reducing her number of hours from 36 to 32? Well, I think she claims that, but that was the plan that predated, by months, her first recognition of that to the point of making any statement about it. When did it first appear as part of the plan that her hours would be reduced from 36 to 32? Before or after the Wendlandt conversation? It was approximately three months before the Wendlandt conversation. Where do I find that in the record? That's going to take a moment. It was in May of 1998. But I'd like you to direct me to the page in the record where it says that where I can see that Walden was part of that plan or her position was part of that plan and the reduction was 36 to 32. I would have thought you would have had that page bronzed. Well, there's reference to it in the Statement of Undisputed Facts, in fact, number 48 on page 52 of our excerpts of record. The FACT excerpts?  The FACT excerpts? Yes. Okay, I'm sorry. Which page is it? It's on page 52 of the excerpts. The base numbers? Correct. And I'm going to try and quickly find the actual. And which number is it? Number 48. It was the reorganization plan. Well, 47 and 48 spoke about May 1998, the reorganization plan specifically reducing the financial services analyst position from 36 to 32, splitting the financial services clerk position and reducing the senior clerk from 36 to 32. Undisputed fact? Yes. Agreed to by both sides? I believe it was, but I'm going to look at their record. It's a separate statement of undisputed material facts. I'm going to look at their response to that. And I'm going to run out of time trying to find that one. I believe that that was undisputed and it was May 11, 1998, that that was presented to the town council. And it also goes into page 50. And her own deposition testimony, which is referenced on fact 50, which is on the excerpts of record of the appellees, page 53, references Walden's deposition where she said that she could have performed her job within 32 hours as part of that reorganization plan. Thank you. So, and I want to go back about the desk. That means you're done. Pardon? You're out of time. Thank you. KHSI, you have 10 minutes.
judges: B.fletcher, Kozinski, Trott